STATE of Missouri,
Plaintiff-Respondent,

v.

Henry MILLER, Defendant-Appellant.

No. 49020.

Missouri Court of Appeals,
Eastern District,
Division Four.

May 6, 1986.

Motion for Rehearing and/or Transfer
Denied June 4, 1986.

Application to Transfer Denied
July 15, 1986.

John Putzel, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SATZ, Judge.

Defendant, Henry Miller, was convicted by a jury of murder, in the second degree, § 565.004, RSMo 1978,[1] and was sentenced to twenty-five years imprisonment. Defendant appeals. We affirm.

Defendant's sole contention on appeal is the state failed to make a submissible case. To resolve this issue, we view the evidence and inferences in the light most favorable to the verdict and disregard all contrary evidence and contrary inferences. *E.g., State v. Overkamp,* 646 S.W.2d 733, 736 (Mo.1983). We do not weigh the evidence but determine whether the evidence was sufficient for reasonable persons to have found defendant guilty as charged. *E.g., State v. Porter,* 640 S.W.2d 125, 126 (Mo. 1982).

The state's case is based primarily on circumstantial evidence. Defendant and the victim, Barbara Miller (Barbara), were married in February, 1977. On Friday, August 21, 1981, Barbara left the apartment she shared with defendant, taking their daughter with her, and moved in with her mother, Mrs. Johnson.

Defendant was extremely upset that Barbara had moved out of their apartment. He spent the weekend outside Mrs. Johnson's house trying to persuade Barbara to return. On Saturday, at 3:30 a.m., Barbara's sister noticed defendant waiting outside the house and, at his insistence, took him upstairs to see Barbara. Barbara refused to see him and told him to get out. Defendant, at first, refused to leave but finally left at Mrs. Johnson's insistence. On Sunday morning, defendant appeared again and began shouting for his daughter. After a period of time, Mrs. Johnson came out, and defendant told her "everyone was against him" and, if Barbara didn't come back to him, he would blow up Mrs. Johnson's house.

On Monday, August 24, Barbara filed for an order of protection, and, while in the courtroom, defendant followed Barbara as she repeatedly changed her seating. After the order of protection was issued, Barbara, afraid to return to her car alone, was accompanied by a deputy sheriff. When they reached her car, they discovered the spark plugs had been disconnected; a deed defendant admitted he committed.

Defendant also repeatedly threatened to kill Barbara. On the same Monday, defendant told a friend of his he could not stand losing Barbara and he would kill her, then take an "overdose" to avoid the consequences. Also, on that Monday and on the next day, defendant's sister, Kathy, overheard defendant tell Barbara by phone that if she did not come back to him, he would kill her and himself. Then, on Wednesday morning, August 26, 1981, the day of Barbara's death, defendant and Barbara were seen and heard arguing in front of Barbara's place of work. Defendant was overheard to say, "if I can't have you, nobody else will. You will be one dead m_____ f_____."

Around noon, on Wednesday, defendant's sister, Kathy, saw Barbara leaving work. Defendant followed Barbara in his car. At that time, Kathy was leaving work with

---

1. Section 565.004, RSMo 1978 has since been repealed, recodified and redefined in § 565.021, RSMo Supp.1984. This change does not affect this case.

Jim Freiner, a co-worker, to eat lunch. She felt ill, however, and Mr. Freiner drove Kathy to her apartment, which is in the same building and directly below defendant's apartment. When they reached Kathy's apartment, Mr. Freiner and Kathy saw the cars of defendant and Barbara parked outside.

After entering her apartment, Kathy went to lie down. When she reached her bedroom, she heard some moaning and the sound of Barbara's voice saying, "I love you," coming from the upstairs apartment. Kathy sensed something was wrong and called defendant on the phone. Defendant answered and told Kathy to come up and see what was wrong for herself.

Kathy and Mr. Freiner went upstairs. They proceeded to the back bedroom and discovered Barbara lying across the bed with a stab wound in her stomach. Barbara's brassiere and blouse were pulled up over her breasts and her pants were pulled down to her ankles. Defendant stood near the bed with two knives in his hands, a large kitchen knife and a smaller steak knife. Defendant said he was not going to jail for murder and he was going to kill himself. He then fled with the knives. Barbara died enroute to the hospital. Subsequently, defendant was apprehended by police in Greenville, Indiana.

Based on these facts, the trial court instructed the jury it could find the defendant guilty of murder in the second degree. Those principles concerning a charge of second degree murder relevant here are well known. Murder in the second degree is the killing of a human being, committed willfully, premeditatedly and with malice aforethought. *E.g., State v. Mannon,* 637 S.W.2d 674, 678 (Mo. banc 1982); *State v. Dixon,* 655 S.W.2d 547, 559 (Mo.App.1983), *cert. denied,* 464 U.S. 1072, 104 S.Ct. 982, 79 L.Ed.2d 219 (1984). The intent for murder, second degree may be and often is inferred from the operative facts surrounding the killing. *State v. Harris,* 673 S.W.2d 490, 492 (Mo.App.1984); *State v. Gillam,* 588 S.W.2d 13, 16 (Mo.App.1979). Thus, premeditation and/or malice may be

inferred from a defendant's previous threats to kill the victim. *State v. Overkamp,* 646 S.W.2d at 737. If the circumstantial evidence is used to prove the murder, however, the operative facts must be consistent with each other, consistent with guilt and inconsistent with any reasonable theory of innocence. *E.g. State v. Prier,* 634 S.W.2d 197, 199 (Mo. banc 1982).

Defendant has no quarrel with these principles, and he admits the facts as related are consistent with each other and "tend to prove guilt." Defendant, however, contends these facts are not inconsistent with his theory of innocence, which, he argues, is a reasonable theory.

Defendant's theory is based upon his testimony at trial. Defendant testified that Barbara unexpectedly appeared at his apartment to get baby clothes. Then, he said, Barbara went into the baby's bedroom, pulled a large kitchen knife from her purse and assaulted him. A struggle ensued, and Barbara fell on top of the knife. He picked Barbara up, placed her on the bed and pulled her blouse up and pants down to see where she was injured.

Defendant's urged theory is not only unreasonable, it borders on the bizarre. After defendant's consistently repeated threats to kill Barbara, defendant would have a reasonable person believe Barbara came to his apartment, alone, proceeded to assault him with a knife and then conveniently fell on the knife.

More important, the operative facts, if viewed rationally, are inconsistent with defendant's proffered theory of innocence. For example, at trial, Dr. Graham, a forensic pathologist, testified that, aside from bone, skin offers the most resistance to a sharp instrument. He further stated the abdomen itself offers little resistance once a sharp instrument penetrates the skin. The knife which caused Barbara's wound was ten to twelve inches long. The wound which caused Barbara's death was approximately three and one-half inches deep. The knife did not strike bone to arrest its progress. If defendant's explanation is accurate, the weight of Barbara falling on

the knife, combined with the weight of defendant falling on her, would surely provide enough force to drive the knife deeper into, if not through, Barbara's body.

Defendant also testified it was after he and Barbara fell and after the knife cut into her body that he picked her up and laid her across the bed. It was while Barbara was lying on the bed, defendant testified, that she said "I love you." According to defendant, she did not shout but spoke in a normal voice. While this was going on upstairs, Kathy, defendant's sister was in the room directly below. She heard neither sounds of a struggle nor the sound of bodies falling. She did, however, hear Barbara moaning and also heard her say "I love you." Defendant's story requires one to believe the ceiling in Kathy's room muffled the sounds of a struggle and the sound of two bodies falling but did not muffle the sound of Barbara's normal speaking voice.

In addition, defendant denied having sexual relations with Barbara. He said he had to pull Barbara's pants down to her "knees" and her blouse and brassiere up above her breasts in order to locate a stomach wound approximately three and one-half inches deep. However, a vaginal smear from Barbara revealed the presence of sperm, which could not have been present longer than twenty-four hours prior to Barbara's death.

We need go no further and belabor the point. Quite simply, defendant's explanation is not reasonable.

Defendant also cites *State v. Black*, 611 S.W.2d 236 (Mo.App.1980) and contends the state may not rest its case solely on the inaccuracy or unreasonableness of defendant's testimony and defense. Defendant's reliance on *State v. Black* is misplaced.

In *Black*, as here, there was no eyewitness to the killing except for the defendant. In *Black*, however, the state's circumstantial evidence failed to support an inference that the killing was intentional, and we held the state could not cure this defect by showing certain aspects of the defendant's story were either mistaken or fabricated. *Id.* at 241. In the present case, the

state had no need to rely on the weaknesses in defendant's story. Defendant's threats by word and deed were more than sufficient to establish his intent to commit murder in the second degree.

Judgment affirmed.

CRANDALL, P.J., and PUDLOWSKI, J., concur.